BART F. VIRDEN, Judge
In December 2000, the Benton County Property Owners' Improvement District No. 7 (the "District") issued $ 4.4 million in special-assessment bonds to fund the construction of infrastructure improvements for the proposed Sugar Creek subdivision in Benton County. Appellants Larry Williams, Gregory Peck, and Pete Netzel, who were investors in the development company that made the improvements to the land, each executed guaranty agreements in which they guaranteed payment of the principal and interest due on the bonds at maturity.[1] The bonds matured ten years later with an unpaid principal balance of $ 3.48 million. Special-assessment taxes, which the District pledged as security for repayment of the bonds, were also delinquent. Appellee Bank of the Ozarks (the "Bank"), as trustee for the bondholders, sued the appellants for breach of contract when they failed to pay the unpaid balance according to the terms of their guaranty agreements. The circuit court granted summary judgment in favor of the Bank. The appellants now appeal the circuit court's order. We affirm.
I. Factual Background
In 2000, several property owners in Benton County petitioned the county court to form an improvement district for the purpose of creating a residential subdivision. The court granted the petition and formed the District for the purpose of making the infrastructure improvements typical of a subdivision, including the construction of waterworks and the paving of streets and sidewalks. The court also appointed three persons named in the petition to the District's board of commissioners.
Shortly thereafter, the District hired an engineer to prepare plans for the subdivision, including the specifications for the infrastructure and improvements. The District also hired an assessor to calculate the "assessed benefit," or the difference between the current value of the property and its increased value with the proposed improvements, for each parcel in the district.
The District used the assessed benefit to calculate a special tax, which constituted *438 a lien on the property and was due annually to the county tax collector. The District issued an order on November 3, 2000, that levied the tax, and on December 1, 2000, it entered into a pledge-and-mortgage agreement in favor of the Bank.
The pledge and mortgage provided, in pertinent part, that the maturity date of the bonds was December 1, 2010, and the District pledged the proceeds of the special tax to the Bank "for the purpose of securing the payment of the [b]onds and the interest thereon as they severally mature[.]" The pledge and mortgage further provided that the special tax "shall be levied and collected annually until the principal of and interest on all outstanding [b]onds are paid in full[,]" and it defined the term "bonds outstanding" as "[b]onds of the District which have not matured." It declared, moreover, that a default occurred when, inter alia , there was a "default in the payment of the principal of or interest on any [b]ond when due[.]"
The pledge and mortgage also addressed how the Bank was to apply the tax proceeds once it received them from the District. First, the Bank was required to deposit money into a "Bond Fund" to "pay all principal of, interest on, and [t]rustee's fees in connection with the [b]onds which will mature or become due" in the following year. Second, the Bank was to make deposits into a "Debt Service Reserve Fund" whose assets "shall be applied to pay [t]rustee's fees, interest on the [b]onds, and principal of the [b]onds to the extent moneys in Bond Fund are insufficient for that purpose."
The appellants, who were investors in Sugar Creek, LLC, the developer and principal owner of the property in the proposed subdivision, thereafter executed identical guaranty agreements "as [an] inducement to the purchase of the bonds." The agreements provided that in the event of a default, each appellant agreed "to pay the principal and accumulated interest on the [b]onds at maturity or earlier redemption," and the appellants' obligations as guarantors arose "absolutely and unconditionally when the [b]onds [were] issued, sold, and delivered by the District." (Emphasis added.)
The appellants apparently expected that the bonds would be redeemed well before the maturity date, as each lot sold to buyers who could pre-pay the special tax associated with each lot at the time of purchase. Sales apparently did not go as expected, however, and according to the appellants, "in 2010, there was a realization that the bonds would not be paid off when [they] matured on December 1, 2010." As a result, the appellants-who had been paying the special taxes on the unsold lots-did not pay the 2010 special-assessment tax when it became due on October 10, 2010, because, as the appellants admitted below, "default on the bonds was imminent."
Indeed, the bonds matured on December 1, 2010, with an outstanding balance of $ 3.48 million. On January 4, 2011, the Bank brought an action to foreclose on the pledge and mortgage securing the bonds.[2] The appellants and other guarantors were originally named as defendants to the lawsuit, but they were later dismissed without prejudice. On February 7, May 2, *439 and July 14, 2012, the Bank was awarded partial judgments granting foreclosure on the real property in the subdivision. The property was later sold to the Bank for credit bids totaling $ 1,492,000, leaving an outstanding principal balance of $ 1,988,000 due on the bonds.
On February 29, 2012, shortly before the first foreclosure sale, James McCord, the attorney for the District, wrote a letter to the Benton County Collector that the appellants would later assert was evidence of a coordinated effort-with the Bank-to have the special tax removed before the Bank purchased the property in foreclosure (whereupon, the appellants say, the Bank would have been liable to pay the special tax). In the letter, Mr. McCord erroneously told the collector that "the [b]onds sold by the District matured on February 1, 2010," and he requested that she "have the records in the Benton County Collector's Office reflect that the tax levied by the District is not delinquent on any lot or parcel in the District for years 2010 or 2011." Mr. McCord also told the collector that "[n]o taxes are due the District for 2012 or any future year," and he further requested removal of "the tax levied by Benton County POID No. 7 -Sugar Creek Project from the [c]ollector's tax roll for improvement districts."
On April 1, 2015, the Bank filed a complaint in the Circuit Court of Benton County alleging that the appellants breached their guaranty agreements when they "failed to pay their proportional part of the remaining balance due on the [b]onds in spite of demand therefor." The Bank sought each appellant's share of the $ 2,802,539 total principal and accumulated interest that remained outstanding, as well as attorney's fees.
On June 29, 2017, the Bank followed its complaint with a motion for summary judgment, arguing that the undisputed facts demonstrated that each appellant executed an absolute guaranty that fixed his liability for the outstanding debt on the bonds when they matured on December 1, 2010, and they failed to pay their respective percentage of the indebtedness.
The appellants filed countermotions for summary judgment. According to the appellants, the undisputed facts demonstrated that they were relieved of their obligations as guarantors because the Bank "failed to meet certain conditions of the [g]uaranty [a]greement" and thereby materially altered its terms. The appellants also asserted that the Bank could not enforce the guaranty agreement because it "improperly released the collateral [i.e., the special tax] securing the debt obligation guaranteed by the guarantors."
Specifically, the appellants argued that their contract with the Bank was embodied not only in the guaranty agreement, but also in the tax order and the pledge and mortgage. Taken together, the appellants said, these documents-and Arkansas law-established that their liability as guarantors was conditioned on the Bank's continued collection of the special tax after the bonds matured and until they "were paid in full." According to the appellants, the Bank materially altered the conditional guaranty agreements-and impaired the collateral securing the debt on the bonds-when it failed to ensure the collection of the special tax beyond the maturity date of the bonds and, in alleged coordination with Mr. McCord, sought to have the special tax removed from the rolls of the county collector. The appellants asserted, therefore, that these facts discharged them from liability.
The circuit court granted the Bank's motion for summary judgment and denied the appellants' countermotion for summary judgment. The circuit court ruled that the guaranty agreements were "not ambiguous, *440 " and the obligations of the appellants "were fixed upon default which occurred on October 10, 2010[,] when the [s]pecial [t]ax became delinquent and when the [b]onds matured [on] December 10, 2010[.]" The circuit court also ruled that "[a]fter the [b]onds matured, the [Bank] was not obligated to continue to assess and collect the [s]pecial [t]ax because by definition in the pledge and mortgage, the [b]onds were no longer outstanding." Moreover, according to the circuit court, the guaranty agreements "constitute[d] absolute and unconditional guaranties, and, by their terms, the [appellants] waived their right to an impairment of collateral defense or to challenge the acts or omissions by the [Bank]."
On appeal, the appellants first argue that the circuit court erred by ruling that the guaranty agreements were not materially altered by the Bank's alleged failure to collect the special tax after the bonds had matured. According to the appellants, Arkansas law, as well as the tax order and pledge and mortgage, establish that their liability as guarantors was conditioned on the continued collection of the special tax. The appellants additionally argue, in a related point, that the Bank's failure to ensure the continued collection of the tax was an unjustified impairment of collateral that released them from liability under the guaranty agreements.
In response, the Bank argues that the circuit court correctly ruled that the guaranty agreements were unambiguous, and therefore, the parol-evidence rule prohibited using the pledge and mortgage and the taxing order to vary the meaning of the plain language in the guaranty agreement. According to the Bank, the absolute and unconditional terms of the guaranties fixed the appellants' liability at default, and therefore, events that occurred after the bonds had matured could not release the appellants from liability. The Bank also asserts that the absolute and unconditional terms of the guaranty agreements waived any claim of impairment of collateral.
Appellants Larry Williams and Gregory Peck further argue that the circuit court erred by granting summary judgment because there was a genuine issue of material fact regarding the Bank's alleged misapplication of money from the Debt Service Reserve Fund. According to Williams and Peck, the Bank has not rebutted evidence demonstrating that, in alleged violation of the terms of the pledge and mortgage, the Bank applied money from the fund toward fees and other miscellaneous expenses, rather than toward the principal on the bonds.
II. Standards of Review
A circuit court may grant summary judgment only when it is apparent that no genuine issues of material fact exist requiring litigation and that the moving party is entitled to judgment as a matter of law. Blevins v. Hudson , 2016 Ark. 150, at 3, 489 S.W.3d 165, 167. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. Id.
"Ordinarily, on appeal from a summary-judgment disposition, the evidence is viewed in the light most favorable to the party resisting the motion, and any doubts and inferences are resolved against the moving party." Abraham v. Beck , 2015 Ark. 80, at 8, 456 S.W.3d 744, 751. "[I]n a case where the parties agree on the facts," however, "we simply determine whether the appellee was entitled to judgment as a matter of law." Id. at 8, 456 S.W.3d at 751-52. Indeed, "[w]hen parties file cross-motions for summary judgment ... they essentially agree that there are no material *441 facts remaining, and summary judgment is an appropriate means of resolving the case." Id. at 8, 456 S.W.3d at 752. "As to issues of law presented, our review is de novo." Id.
III. Discussion
As we indicate above, the appellants argue that their agreement is demonstrated not only by the guaranty documents themselves, but also in the pledge and mortgage and the taxing order, which they say demonstrate that the Bank had an obligation to ensure collection of the special tax after the bonds had matured. They also allege that continued collection of the special tax was required by Arkansas law. They assert, therefore, that the Bank's alleged failure to collect the special tax after the bonds had matured was a material alteration and an impairment of collateral that released them from liability.
A. Parol Evidence
"The parol-evidence rule prohibits the introduction of extrinsic evidence, parol or otherwise, which is offered to vary the terms of a written agreement; it is a substantive rule of the law, rather than a rule of evidence, and its premise is that the written agreement itself is the best evidence of the intention of the parties." Hurt-Hoover Invs., LLC v. Fulmer , 2014 Ark. 461, at 11, 448 S.W.3d 696, 703. "Where the meaning of a written contract is ambiguous," however, "parol evidence is admissible to explain the writing." Id. at 12, 448 S.W.3d at 703. "The initial determination of the existence of ambiguity rests with the court and, if the writing contains a term which is ambiguous, parol evidence is admissible and the meaning of the ambiguous term becomes a question of fact for the fact-finder." Id.
The appellants notably do not take issue with the circuit court's ruling that the terms of the guaranty agreement are unambiguous, and looking to the language of the agreements, it is plain that (1) the appellants unconditionally guaranteed the payment of the bonds; (2) their liability as guarantors would arise when the bonds matured; and (3) the Bank did not assume any responsibility for the collection of the special tax. We find it unnecessary, therefore, to examine extrinsic evidence to interpret the agreements.
Indeed, the guaranty agreements declare that "[t]he obligations of [the guarantors] ... shall arise absolutely and unconditionally when the Bonds shall have been issued, sold, and delivered by the District." The agreements further provide that the guaranties "and, hence, ... sums due at maturity or redemption is in no way dependent on the completion of the [p]roject or quality of construction," and therefore, the appellants' obligations were "absolute and unconditional."
Moreover, the guaranty agreements plainly provide that the appellants "guarantee[d] to the [Bank] the payment of all sums necessary ... to pay the principal and accumulated interest on the [b]onds at maturity or earlier redemption. " (Emphasis added.) The appellants also agreed that the Bank "may make demand on [the guarantors] ... at any time after the [s]pecial [t]ax becomes due or the principal matures , in its sole discretion." (Emphasis added). Finally, the appellants agreed that the Bank "assume[d] no responsibility whatsoever for collecting sufficient sums in this manner to pay any of the [s]pecial [t]ax or any sums due at maturity." Accordingly, because the appellants do not identify any ambiguous terms warranting the examination of extrinsic evidence-and there are none-we look only to the guarantee agreements to determine whether the removal of the special tax was *442 a material alteration that discharges the appellants from liability.
B. Material Alteration
"A guarantor, like a surety, is a favorite of the law, and [his] liability is not to be extended by implication beyond the expressed terms of the agreement or its plain intent." Helena Chem. Co. v. Caery , 93 Ark. App. 447, 452, 220 S.W.3d 235, 237 (2005) (internal quotation and citations omitted). "A guarantor is entitled to have [his] undertaking strictly construed and [he] cannot be held liable beyond the strict terms of [his] contract." Id. "Any material alteration of the obligation assumed, made without the consent of the guarantor, discharges [him]." Id. For the reasons that follow, the removal of the special tax did not constitute a material alteration of the guaranty agreements, as the appellants claim.
As we note above, the guaranty agreements were "absolute and unconditional," and therefore, the liability of the appellants as guarantors "became fixed upon default." Lindell Square Ltd. P'ship v. Savers Fed. Sav. & Loan Ass'n , 27 Ark. App. 66, 76, 766 S.W.2d 41, 47 (1989). Additionally, the agreement makes it plain that the appellants would be liable for any outstanding debt when the bonds mature, and the Bank does not assume any responsibility for collection of the special tax. The failure to collect the special tax after the bonds had matured, therefore, did not materially alter the appellants' obligations under the guaranty agreement.[3]
C. Arkansas Law
The appellants also argue, however, that the choice-of-law provision in the guaranty agreement, providing that it "shall be construed and enforced in accordance with the laws of the State of Arkansas," gave them the expectation that the Bank would follow Arkansas law as it carried out its obligations under the guaranty agreements. They appear to argue, in particular, that Arkansas Code Annotated section 14-93-126(a)(2)(A) (Repl. 1998), providing that the District "shall see to it that a tax is levied annually and collected ... so long as it may be necessary to pay any bond issued," obligated the Bank to do the same. Appellant Netzel additionally suggests Arkansas Code Annotated section 14-93-123(h)(1) (Repl. 1998), providing that those who purchase land after a tax foreclosure must pay any future special tax associated with it, required the Bank to pay the special tax after it had purchased the subdivision's property in foreclosure. Even if we could agree that Arkansas law required collection of the special tax beyond the maturity date of the bonds, we decline to reach these arguments because the appellants failed to preserve them with a ruling in the circuit court.
"An appellant has the burden to obtain a ruling on an issue in order to preserve the issue for appeal." Sloop v. Kiker , 2016 Ark. App. 125, at 4, 484 S.W.3d 696, 699. This court will not reach an issue in the absence of a ruling, nor will it presume a ruling from the circuit court's silence. Id. Therefore, when a circuit court's order specifies particular grounds for the court's decision, only those grounds are subject to the court's review. Id. "Other arguments that the appellant raised below but did not obtain a ruling on are not preserved for appeal, and we are precluded from addressing them." Id.
*443 Citing sections 14-93-123 and 14-93-126, the appellants argued below that the Bank's motion for summary judgment should be denied-and theirs granted-because they "relied upon the [Bank's] adherence to Arkansas law which makes clear that the [s]pecial [t]ax will continue to be collected until the bonds are fully retired." A rejection of this argument, however, is not among the particular grounds underlying the circuit court's decision. Indeed, the circuit court relied only on the terms of the pledge and mortgage to rule that the Bank "was not obligated to continue to assess the [s]pecial [t]ax" after the bonds had matured. Accordingly, because the appellants failed to obtain a ruling on their arguments based on Arkansas law, we decline to reach the issue.
D. Impairment of Collateral
The circuit court likewise did not err by ruling that the appellants waived their defense of impairment of collateral. "[A]n absolute and unconditional guaranty which contains a term providing that omission of the holder does not affect the liability of the guarantor waives any defense based on impairment of collateral." Smith v. Elder , 312 Ark. 384, 395, 849 S.W.2d 513, 519 (1993).
As we discussed above, the guaranty agreements establish that the appellants' obligations were absolute and unconditional. They provide, moreover, that "[n]o delays or omission to exercise any right or power accruing upon any default, omission or failure or performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof[.]" The agreements additionally provide that the Bank "assum[ed] no responsibility whatsoever for collecting sufficient sums ... to pay any of the [s]pecial [t]ax or any sums due at maturity." Therefore, because the appellants quite clearly waived their current claim of impairment of collateral, we affirm.
E. The Debt Service Reserve Fund
In the circuit court, separate defendant Frank Miller filed a response to the Bank's motion for summary judgment and brief in support on July 20, 2017, arguing, among other things, that the Bank's motion should be denied because there was a genuine issue of material fact regarding whether the Bank fulfilled its obligation, as provided in the pledge and mortgage, to apply money held in the Debt Service Reserve Fund to the principal owed on the bonds. According to Miller, the Bank's answers to interrogatories indicated that it "muddled disbursements from the Debt Service Reserve Fund with disbursements from a separate account titled 'Administrative Fund' " and did not direct any money "toward reduction of the principal and accrued interest on the bonds." The circuit court granted the Bank's motion for summary judgment without addressing the Debt Service Reserve Fund. Appellants Williams and Peck, claiming that they adopted Miller's argument by reference in their arguments in the circuit court, now assert that the circuit court erred when it failed to find a genuine issue of material fact on this issue. Because Williams and Peck failed to obtain a ruling on this issue, we affirm.
"An appellant has the burden to obtain a ruling on an issue in order to preserve the issue for appeal," Sloop , 2016 Ark. App. 125, at 4, 484 S.W.3d at 699, and the circuit court did not address the appellants' argument regarding the Debt Service Reserve Fund in its order granting the Bank's motion for summary judgment. Moreover, the circuit court's order, which relies on particular grounds to grant the Bank's motion for summary judgment, is not-contrary to Williams's and Peck's argument-a "blanket ruling" that encompasses this issue.
*444 Therefore, we also decline to reach this argument regarding the Debt Service Reserve Fund and affirm.
IV. Conclusion
The unambiguous terms of the guaranty agreements demonstrate that the appellants' obligations as guarantors were fixed when the District failed to pay the bonds when they matured on December 1, 2010. The subsequent failure to collect the special tax after the bonds had matured, therefore, did not materially alter the terms of the guaranty agreements. The appellants also waived any defense of impairment of collateral when they agreed that their obligations were absolute and unconditional, and any omission by the Bank did not affect their liability. The appellants' arguments concerning application of Arkansas law and the Debt Service Reserve Fund, moreover, are not preserved for our review. Accordingly, we affirm the circuit court's order granting the Bank's motion for summary judgment and denying the appellants' countermotions for summary judgment.
Affirmed.
Murphy and Brown, JJ., agree.

Pete Netzel died while this appeal was pending. Karen Netzel, as trustee of the Netzel Joint Trust, was substituted as a party on August 22, 2018.

The Bank was collecting the taxes in the District's stead pursuant to Arkansas Code Annotated section 14-93-123(d)(B)(2) (Repl. 1998), which provides that "[i]n case the commissioners shall fail to commence suit within sixty (60) days after the taxes become delinquent, the holds of any bond issued by the district or any trustee on behalf of the holder of any bond issued by the district shall have the right to bring suit for the collection of the delinquent assessments[.]"

Indeed, the appellants' admission below-that they stopped paying the special tax when default on the bonds was imminent-suggests that, contrary to their assertions here, they understood that collection of the special tax would cease when the bonds matured.